UNITED STATES DISTRICT COURT <u>FOR ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MICHAEL KING,                                    :          MEMORANDUM
                                                 :          <u>AND ORDER</u>
                                                 :
                               Plaintiff,        :
                - against -                       :
                                                 :          99 CV 3669 (JG)
                                                 :
CITY OF NEW YORK, et al.,                         :
                                                 :
                                                 :
                               Defendants.        :
-----------------------------------------------------------------X
MICHAEL KING,                                    :
                                                 :
                               Petitioner,        :
                                                 :
                -against-                         :
                                                 :          05 CV 3247 (JG)
                                                 :
NEW YORK STATE DIVISION OF PAROLE,                :
ROBERT DENNISON,                                  :
                                                 :
                               Respondent.        :
-----------------------------------------------------------------X

JOHN GLEESON, United States District Judge:

        As the caption reflects, this Memorandum and Order disposes of applications for

relief in two related actions prosecuted by Michael King. Docket No. 99 CV 3669 is a *pro se*

civil action pursuant to 42 U.S.C. §§ 1983, 1985(2), 1985(3), and 1986 against the City of New

York ("the City"), Sergeant John Asam and Police Officers Michael Morra and Joseph Wilhelm

("the arresting officers"), Assistant District Attorneys Richard Johnson and Barry Pinto,

Detectives Alan McPherson and William Campisi, Lieutenant Angelo Carbone, and Police

Officer Cheryl Cox.[1] On September 15, 2004, I adopted a report and recommendation of United

--------------------------------

[1]      The action has been dismissed as to several other defendants.

States Magistrate Judge Roanne L. Mann, narrowing King's claims to include only: (1) a claim that the arresting officers used excessive force on King during and subsequent to his arrest on April 22, 1999; (2) a claim that the April 22, 1999 arrest was unconstitutional for want of probable cause; (3) a claim that certain defendants conspired to cover up the alleged misconduct of April 22, 1999; (4) a claim that certain defendants coerced incriminating statements from King the day after the arrest; (5) a claim of malicious prosecution by certain defendants; and (6) a claim against the City alleging enterprise liability. Before me now are the parties' cross-motions for summary judgment in that action.

Docket No. 05 CV 3247 is a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which King challenges his conviction of the March 31, 1999 robbery of Jose Rodriguez. Pursuant to his plea of guilty to that robbery, King was sentenced to five years in prison and five years of post-release supervision.

For the reasons set forth below, the City's motion for partial summary judgment in No. 99 CV 3369 is granted, King's cross-motion for summary judgment in that action is denied, and the petition for a writ of habeas corpus in No. 05 CV 3249 is denied.

BACKGROUND[2]

A.    *The Arrest*

Michael King was arrested on April 22, 1999 on the corner of 29th Avenue and Gilmore Street in Queens County, New York. King's version of the facts leading up to his arrest differs substantially from that of the arresting officers. According to King, he was riding as a passenger in Norberto Carabali's livery vehicle when, "as a result of [Carabali's] own negligence

---

[2]    Unless otherwise noted, the facts set forth are not in dispute.

over a dispute with the plaintiff," the vehicle swerved into a parked car on Gilmore Street. Plaintiff[']s [C]ross Motion for a Summary Judgment ("Pl. Br.") 1; *see also* King Dep. 133-36, Aug. 1, 2001. King then got out of the car and walked up the block to the corner of 29th Avenue. Pl. Br. 1; *see also* King Dep. 137, Aug. 1, 2001. King provides a copy of a 911 report, which he claims indicates that, at the "p[re]cise time" he approached the corner, a 911 caller reported a "disturbance" by a large group of individuals at a house on the corner. Pl. Br. 1; *see also id.* at 3 (claiming that the 911 call came at "2241 hrs," "seconds before plaintiff[']s arrest"); *id.* Ex. F (911 report). The report does not mention the race or other descriptions of the perpetrators of the disturbance. *Id.* at 1.

Asam, Morra and Wilhelm responded to the disturbance in an unmarked police vehicle. *Id.* According to King, they saw that he was the only person on the street and "automatically assumed [he] was the person making a disturbance . . . [s]olely because of his race." *Id.* at 3; *see also* King Dep. 138-39, Aug. 1, 2001. Only after King was ordered to lie down at gunpoint, handcuffed, kicked, and maced with an entire can of pepper spray did the arresting officers "discover[]" that King was likely not a perpetrator of the disturbance they had responded to. Pl. Br. 1. However, the officers subsequently noticed the livery-vehicle collision a half-block away, retrieved Carabali from the vehicle, and procured an identification of King from Carabali. *See id*.

The arresting officers assert a different version of the April 22, 2001 events. Morra, Asam, and Wilhelm claim they were assigned to patrol and investigate an unsolved pattern of Queens livery-vehicle robberies involving the use of knives, guns, and other physical force. *See* Morra Aff. ¶ 3; Wilhelm Aff. ¶ 3. Morra claims that at 2241 hours his unmarked

police vehicle, which he was driving with Asam and Wilhelm as passengers, was stopped at a stop sign at the intersection of 29th Avenue and Gilmore Street. Morra Aff. ¶¶ 4-5; Wilhelm Aff. ¶¶ 4-5. Morra heard a crashing sound and a car alarm on Gilmore Street; looking in the direction of the crash, Morra saw a livery vehicle crashed into a parked car. Morra Aff. ¶¶ 5-6. Morra drove the police car over to the crashed livery vehicle, and claims to have seen King leaning over the front seat and striking the livery driver "repeatedly about the head and facial area" with a knife. *Id.* ¶ 7; *see also* Wilhelm Aff. ¶ 6; Asam Aff. ¶ 6.[3]

 The arresting officers got out of their car, drew their firearms, and approached the livery vehicle, at which point Morra opened the rear driver's side door. *See* Morra Aff. ¶¶ 8-11; *see also* Wilhelm Aff. ¶¶ 7-10. Wilhelm claims King did not comply with repeated orders to drop the knife. *See* Wilhelm Aff. ¶¶ 11-14; *see also* Morra Aff. ¶¶ 12-15. Morra claims King complied with his second order to drop the knife. *See* Morra Aff. ¶¶ 12-15. Morra pulled King out of the livery vehicle by his shirt; King said to him, "I'm the victim; I'm the victim." *Id.* ¶ 16. Wilhelm claims King "lunge[d] towards Morra." Wilhelm Aff. ¶ 13; *see also* Morra Aff. ¶ 17 ("I observed Michael King attempt to punch me with a closed fist while exiting the vehicle . . . ."). The officers restrained King with handcuffs and pepper spray. *See* Morra Aff. ¶¶ 17-22. The livery driver, later identified as Carabali, told Morra that King had demanded money from him, punched him in the head, and threatened him with a knife. *See id.* ¶ 24. When King had begun to stab him, Carabali reported, he had lost control of the car and crashed. *See id.*

---

[3] King disputes that the officers witnessed him strike Carabali. *See* King Dep. 138, Aug. 1, 2001 ("[T]hey are fucking lying. They didn't see no crash, they didn't see nothing.").

B.      *The Arresting Officers' Use of Force During and After the Arrest*

According to King, the arresting officers "kicked" and "stomped" him as he lay handcuffed on the ground after his arrest, uttering racial slurs as they did so.  Pl. Br. 1.; *see also* King Dep. 199-200, Aug. 2, 2001 ("[T]hey started stomping me out, calling me you stupid nigger and stupid stuff.").  The officers also "emptied a can of mace into his eye[]s that required medical attention."  Pl. Br. 1; *see also* King Dep. 199, Aug. 2, 2001 ("[T]hey sprayed me with mace and I turned my head this way and they sprayed me with mace, then I turned my head this way, and then they started spraying me again.").  King claims that he posed no threat to the police and did not try to resist, complying peacefully with the officers' command to "get on the ground."  King Dep. 199, Aug. 2, 2001.

After the arrest, the officers took King to the 115th Precinct, where, King claims, one officer threw him "headfirst into a holding cell and banged his head against the floor."  Pl. Br. 9; *see also* King Dep. 219, Aug. 2, 2001 ("I was thrown into the cell").  The officers maced him again.  *See* Pl. Br. 9; King Dep. 221, Aug. 2, 2001 ("I was pushed into the cell . . . head first . . . .  Moments later I was pulled out, thrown into a chair, I fell out of the chair, I was maced again, thrown on the floor, my head was banged . . . .").  The assault caused King first- and second-degree burns to the eyes, tenderness to the head, and psychological impairments.  Pl. Br. 9.

For their part, the arresting officers claim that King violently resisted the seizure.  Asam claims that though King complied with an instruction by the arresting officers to drop his knife, King punched, kicked, and attempted to bite Asam.  Asam Aff. ¶ 19.  Morra claims King swung a punch at him.  Mora Aff. ¶ 17.  Morra assisted Asam in "restraining" King by

attempting to grab him and take him down.  *Id.* ¶ 18.  King "violently struggled" when the officers attempted to handcuff him.  Asam Aff. ¶ 20.  Because King continued to resist with violence when he was on the ground, Morra says he employed "two approximately one-second bursts of pepper spray" to subdue King.  Morra Aff.¶ 21; *see also* Asam Aff. ¶ 23.  The officers eventually "restrained" King.  Asam Aff. ¶ 24.[4]

The arresting officers also dispute King's allegations of abuse at the 115th Precinct.  Morra claims he "placed" King in a cell while he was still handcuffed.  Morra Aff. ¶ 26.  He then "observed Michael King run, head first, into the wall of the holding cell.  [He] grabbed the keys to try to open the cell, and saw Michael King once against smash his head into the wall of the cell.  By the time [Morra] was able to open the cell, [King] had hit his head against the wall at least one more time."  *Id.* ¶ 27.  After Morra removed King from the cell, King "[threw] his body to the ground" in the processing area and "sh[ook] his body and repeatedly smash[ed] his head into the ground."  *Id.* ¶ 28.

C.      *The Line-Up Identifications*

The same day, five livery drivers identified King in line-ups as the perpetrator of earlier livery-vehicle robberies.  *See* Bruzzese Decl. Ex. M, O, R (Line-up Reports of complainants Jose Rodriguez, Reuben Gonzalez, Jose Pesantez); *see also id.* Ex. T (Supplemental Arrest Report reflecting "ID in line-up" by Maximo Mendez); *id.* Ex Q (Supplemental Arrest Report reflecting identification by Ruben Diaz).  In particular, Jose Rodriguez identified King as the individual who "robbed [him] once."  *Id.* Ex. M.

D.      *The Confessions and the Hospital Visit*

---

[4]      Defendants also claim King did not suffer first- or second-degree burns from the pepper spray, citing terminology used in an ambulance call report.  *See* Bruzzese Decl. Ex. S ("Ambulance Call Report").

The day after his arrest, King was interrogated three times.  At 6:10 a.m. and 5:00 p.m., King signed written versions of his *Miranda* warnings.  *See* Bruzzese Decl. Ex. cc, dd. King also produced two signed, handwritten statements, the first of which admitted to carjacking a livery vehicle on April 2, 1999 with a box-cutter, the second of which admitted to an array of robberies of other livery vehicles, including the carjacking at knifepoint of a red Lincoln.  King admitted that he called the driver of that vehicle, using the driver's cell phone, to tell him the location of the vehicle after he abandoned it.  *See id.* Ex. ee, ff.  The first written statement corresponded to a complaint by Mohammed Choudry that he was robbed at knifepoint and carjacked by a white or Hispanic passenger he picked up at 21st Street between 37th and 38th Avenues in Queens County, New York.  *See id.* Ex. G.  The second written statement corresponded in relevant part to a complaint by Jose Rodriguez that his red Lincoln livery vehicle had been carjacked by a "male black," who had also robbed him of a gold chain from around his neck, and who had later answered Rodriguez's cell phone and informed Rodriguez where he could find the abandoned vehicle.  *See id.* Ex. D (Unusual Occurrence Report, Mar. 31 1999), Ex. E (Complaint Report of Jose Rodriguez, Mar. 31, 1999).  The Rodriguez complaint stated that the perpetrator of the carjacking wore a baseball hat.  *See id.* Ex. E.

In addition, at 6:56 p.m. defendants Campisi, McPherson and Pinto elicited a videotaped confession from King, in which King stated that he was read his *Miranda* rights and understood them, stated that he voluntarily provided the two handwritten statements to the police, and provided additional detailed accounts of several livery robberies.  *See id.* Ex. gg.

Also on April 23, 1999, King was treated at Elmhurst Hospital for exposure to mace.  *See* King Dep. 238-39, Aug. 2, 2001.  He was examined by a psychiatrist as well.  *Id.* at

252.  The psychiatrist recommended to King's arraignment judge that he undergo further

psychiatric care in an out-patient setting.  *See* Bruzzese Decl. Ex. ss (medical records).

E.      *King's Allegations About Defendants Carbone and Cox*

King claims, and defendants acknowledge, that Carbone wrote a memorandum to

his supervisor, the chief of patrol, about King's arrest.  *See* Defendant Carbone's Responses and

Objections to Plaintiff's Interrogatories and Requests to Admit ("Carbone's Responses") ¶¶ 2, 4.

King claims that this memorandum does not mention the 911 report of the disturbance, and

altered the time reflecting King's arrest from 2241 hours to 2247 hours.  *See* Pl. Br. 9-10.

Carbone agrees that he represented in the memorandum that "plaintiff quickly exited the vehicle

with knife in hand and was disarmed after a violent struggle," and claims that Asam supplied that

information.  Carbone's Responses ¶ 4.

King also alleges that Cox misrepresented to the press that King stabbed Carabali

and made "personal remarks" about King's "fetish" for Lincoln Town Cars.  Pl. Br. 10.

F.      *The Charges and Indictments*

Carabali signed an accusatory instrument against King the day after the arrest,

attesting, among other things, that King entered his car and demanded his money, threatened to

kill him, punched him, and stabbed him in the head with a knife.  *See* Compl. 2, *People v. King*,

No. 99Q0019749 (N.Y. Crim. Ct. Apr. 23, 1999).  The complaint also stated that Carabali

suffered "bleeding and substantial pain" as a result of King's assault, requiring six stitches to

treat a head wound.  *Id.*  King was also charged with the robberies of complainants Rodriguez,

Gonzalez, Choudry, Diaz, Pesantez, and Mendez.  *See* Bruzzese Decl. Ex. W, X, Y, Z, aa, bb.

Ultimately, however, all the cases against King except those pertaining to Rodriguez and Diaz

were dismissed on speedy trial grounds pursuant to N.Y. Crim. Proc. § 30.30. *See id.* Ex. zz, aaa, bbb, ccc.

Johnson presented the cases pertaining to Rodriguez and Diaz to the grand jury. Johnson Aff. ¶¶ 14, 18. The grand jury heard, among other evidence, testimony by King and the two livery drivers, as well as King's videotaped confession, after which the grand jury returned a true bill. *See* Bruzzese Decl. Ex. ii (Grand Jury Indictment 1719/99). The New York State Supreme Court, Queens County dismissed the indictment, however, ruling that the testimony of the livery drivers was "sufficient evidence to indict," but that the presentation to the grand jury of "some portion" of the videotape, in which King confessed to a "long series of robberies of livery cabs . . . not specifically . . . the incidents charged," was "highly prejudicial." *People v. King*, Ind. No. 1719/99, at 1-2 (N.Y. Sup. Ct. Nov. 5, 1999) (Kron, J.). Johnson's next presentation of the Rodriguez charge, which also secured an indictment, was dismissed on the prosecution's consent because King was not afforded an opportunity to testify. *See* Bruzzese Decl. Ex. ll. Johnson presented the Rodriguez and Diaz charges a third time, and King was indicted yet again. *See id.* Ex. mm.

G.      *The Commencement of the Civil Action, King's Guilty Plea, and Subsequent Proceedings*

Before the indictments, on June 28, 1999, King commenced a civil action pursuant to 42 U.S.C. §§ 1983, 1985(2), 1985(3), and 1986. A flurry of motions and amendments winnowed the claims and defendants to those mentioned above.

On March 5, 2002, King withdrew his plea of not guilty and entered a plea of guilty to the March 31, 1999 robbery of Jose Rodriguez. *See* Bruzzese Decl. Ex. NN at 3, 12 (transcript of plea proceedings). King waived his right to a suppression hearing and his right to

trial by jury, and pled guilty to robbery in the second degree, in violation of N.Y. Penal Law §

160.10(3), admitting that on March 31, 1999 he had robbed Rodriguez of his livery vehicle and

other property at knifepoint in Queens County, New York. *Id.* at 6-9. King also waived his right

to appeal. *Id.* at 12. In exchange, the prosecution waived charging King for various failures to

appear in court, and agreed to a determinate sentence of five years of incarceration and five years

of supervision. *Id.* at 3-4. King testified at the plea proceeding that he understood the nature of

the proceeding and the rights he was waiving, and acknowledged that he had discussed the plea

with his attorney and was not coerced to plead guilty. *Id.* at 5-7, 10-12. King was sentenced

pursuant to the terms of the plea agreement.

On September 15, 2002, King moved *pro se* to vacate his plea pursuant to N.Y.

Crim. Proc. Law § 440.10, alleging the use of perjured testimony, denial of the effective

assistance of his court-appointed counsel, and coercion of his plea. On October 15, 2002, the

state court denied King's motion to vacate, ruling that (1) the claims were based upon matters in

the record and therefore should have been addressed on direct appeal, (2) King pointed to no

facts supporting his argument, and (3), as King did not seriously dispute the voluntariness of his

plea, he had forfeited his right to challenge pre-trial and pre-plea conduct by voluntarily and

knowingly pleading guilty. *People v. King*, Ind. No. 1028/00, at 2-3 (N.Y. Sup. Ct. Oct. 15,

2002) (Blackburne, J.). The court therefore held that King's claims were "both procedurally

barred and without merit." *Id.* at 3. The Appellate Division, Second Department denied

permission to appeal on January 28, 2003.

In January 2004, King appealed his conviction *pro se*, challenging the validity of

his plea and indictment by alleging undisclosed *Brady* material and perjured identification

testimony at the grand jury, and claiming ineffective assistance of counsel.  The Appellate

Division affirmed the conviction in an order that stated in its entirety: "ORDERED that the

judgment is affirmed (*see People v. Pellegrino*, 60 N.Y.2d 636, 467 N.Y.S.2d 355, 454 N.E.2d

938)."  *People v. King*, 775 N.Y.S.2d 911, 911 (2d Dep't 2004).  The Court of Appeals denied

leave to appeal on June 21, 2004.  *People v. King*, 3 N.Y.3d 642 (2004).  King did not petition

the United States Supreme Court for a writ of certiorari.


DISCUSSION

A.      *The Cross-Motions for Summary Judgment*

Defendants move for summary judgment on seven of the eight claims in King's

civil action.  "Defendants concede that there are questions of fact with respect to plaintiff's claim

that Defendants Asam, Morra, and Wilhelm utilized excessive force during the course of his

arrest . . . ."  Memorandum of Law in Support of Defendants' Motion for Partial Summary

Judgment 2.  King cross-moves for judgment in his favor on every claim.

1.      The Summary Judgment Standard of Review

A moving party is entitled to summary judgment "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party must demonstrate that no

genuine issue exists as to any material fact.  *Gallo v. Prudential Residential Servs., Ltd. P'ship*,

22 F.3d 1219, 1223 (2d Cir. 1994).  For summary judgment purposes, a fact is "material" when

its resolution "might affect the outcome of the suit under the governing law."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" when "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Id.* Accordingly, the test

for whether an issue is genuine requires "the inferences to be drawn from the underlying facts

[to] be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec.

Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and citation

omitted).

Once the moving party has met that burden, "the nonmoving party must come

forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587 (quoting

Fed. R. Civ. P. 56(e)) (emphasis omitted). Indeed,

> the moving party may obtain summary judgment by showing that little or no
> evidence may be found in support of the nonmoving party's case. When no
> rational jury could find in favor of the nonmoving party because the evidence to
> support its case is so slight, there is no genuine issue of material fact and a grant
> of summary judgment is proper.

*Gallo*, 22 F.3d at 1223-24 (citations omitted). The nonmoving party cannot survive summary

judgment by simply casting "metaphysical doubt" upon the evidence produced by the moving

party. *Matsushita*, 475 U.S. at 586.

2.     The Excessive Force Claim

King argues he is entitled to summary judgment on his § 1983 claim that the force

used on him by the arresting officers was unconstitutionally excessive. Defendants only oppose

the motion insofar as they claim there are genuine issues of material fact that preclude judgment

as a matter of law. *See* City Defendants' Reply Memorandum of Law in Support of Their

Motion for Summary Judgment 15.

An arrested person's claim that the police used excessive force to execute the

seizure is subject to the Fourth Amendment's objective test of reasonableness. *See Graham v.*

*Conner*, 490 U.S. 386, 395-96 (1989); *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002).

Because "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," the reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

The parties differ widely in their description of the force used on King during and after his arrest. King contends that the police brutalized him even though he posed no threat and did not attempt to resist when the officers told him to "get on the ground." King Dep. 199, Aug. 2, 2001. Once he was handcuffed on the ground, he claims, they "kicked" and "stomped" him, used racial slurs, and "emptied a can of mace" into his eyes. Pl. Br. 1; King Dep. 199-200, Aug. 2, 2001. At the 115th Precinct, he was thrown into a cell, pulled out, thrown into a chair, maced, and thrown on the floor, hitting his head several times. *See* Pl. Br. 9; *see also* King Dep. 219-221, Aug. 2, 2001.

The arresting officers argue that the force they used during the arrest was necessary to subdue King, who, according to them, violently resisted the seizure and posed a threat of danger. They claim King punched, kicked, and attempted to bite Asam, and delivered a punch at Morra. *See* Asam Aff. ¶ 19; Morra Aff. ¶ 17. The officers concede they maced King, but they did so only because he violently resisted being taken to the ground and continued to struggle when he was on the ground. *See* Asam Aff. ¶¶ 20-23; Morra Aff.¶ 21 (claiming he employed "two approximately one-second bursts of pepper spray" to subdue King). The

arresting defendants argue that they were not responsible for any injuries King suffered at the precinct, because King inflicted those injuries upon himself.  Morra, for example, claims he saw King "run, head first" into the wall of his cell three times and repeatedly smash his own head on the floor of the processing area.  Morra Aff. ¶¶ 27-28.

The record thus contains conflicting testimony about whether and to what extent King resisted arrest and attacked the officers, and whether and to what extent King was responsible for any injuries he suffered at the precinct.  The conflict reflects a genuine issue of fact about the reasonableness of the force employed to arrest King.  King's account is detailed, and provides some evidence that the arresting officers used unnecessary force against him while he was restrained.  But just as the fact "[t]hat the Officers' version of the events is markedly different cannot avail them at this stage in the litigation," *Cumberbatch v. Port Auth. of N.Y. and N.J.*, No. 03 Civ. 749(BSJ), 2006 WL 3543670, at *8 (S.D.N.Y. Dec. 5, 2006), King cannot prevail by virtue of his story alone.  It is not my office at this stage to resolve this genuine and material factual dispute.  *See, e.g.*, *Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 342 (E.D.N.Y. 2006) (denying motion for summary judgment given conflicting testimony about proportionality of force used during arrest); *see also Mickle*, 297 F.3d at 122-23 (reversing judgment of a matter of law in favor of defendant officers given conflicting testimony about force used on plaintiff's wrists and shoulder).  Accordingly, King's motion for summary judgment on his § 1983 excessive force claim is denied.

In his fourth amended complaint, King also predicated his excessive force claim

upon the civil rights conspiracy provisions § 1985(2)[5] and § 1985(3)[6]. *See* Fourth Amended Complaint at "First Claim."  In my order of September 15, 2004 granting in part and denying in part King's motion to amend his fourth amended complaint, I characterized the excessive force claim as proceeding solely under § 1983.  *See* Docket Entry 125 at 1.  It appears to me now, however, that King's factual claims might provide some basis for a civil rights conspiracy claim pursuant to § 1985(3),[7] because King's motion papers allege a subjective discriminatory motivation by the arresting defendants that is not relevant to a § 1983 excessive force claim.[8] *See Mickle*, 297 F.3d at 120 (the excessive force reasonableness inquiry proceeds "without regard to" the arresting officers' "underlying intent or motivation").

To state a § 1985(3) claim, King must allege that the arresting defendants believed he "was a member of a protected class, that the defendants conspired to deprive him of his constitutional rights [*i.e.*, his right to be free from unconstitutionally excessive force], that the defendants acted with class-based, invidiously discriminatory animus, and that he suffered

---

[5]     The relevant provision of § 1985(2) is the second clause, which in part makes it illegal for "two or more persons [to] conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny any citizen the equal protection of the laws."  42 U.S.C. § 1985(2).  The right of action provided by this clause is limited to "conspiracies with respect to judicial proceedings in a State or Territory." *Herrmann v. Moore*, 576 F.2d 453, 457 (2d Cir. 1978), *cert. denied*, 439 U.S. 1003 (1978).

[6]     The elements of a civil rights conspiracy claim under § 1985(3) are "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, . . . ; (3) an act in furtherance of the conspiracy; (4) whereby a person is . . . deprived of any right of a citizen of the United States." *Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 2000), *cert. denied*, 534 U.S. 816 (2001) (quoting *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993) (per curiam)).

[7]     As King nowhere alleges that the excessive force by the arresting officers was related to a state judicial proceeding, he does not state a claim under the second clause of § 1985(2).

[8]     I must construe King's *pro se* claims "'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994)); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (per curiam).

damages as a result of the defendants' actions." *Gleason v. McBride*, 869 F.2d 688, 694-95 (2d Cir. 1989).  According to King's motion papers, the arresting defendants detained the "first black male they encountered" on Gilmore Street on April 22, 1999 while they were responding to a disturbance reported by a 911 call.  Pl. Br. 9.  The defendants assumed from King's race that he was the perpetrator of the reported disturbance, even though the 911 caller did not state the race of the perpetrators.  *Id.* at 1.  The defendants beat King in the course of his detention on Gilmore Street, kicked him and stamped on him, and emptied a can of mace into his eyes, *id.*, calling him a "stupid nigger," *id.* at 9.  Such concerted actions of abuse by the arresting defendants, if true, might constitute a cognizable conspiracy under § 1985(3).

King claims he is entitled to judgment as a matter of law on the question. Because the facts are disputed, he is not.  Moreover, because my order of September 15, 2004 led the defendants to believe that the excessive force claim no longer proceeded under § 1985(3), I will afford defendants an additional opportunity to oppose the claim on legal grounds before it is submitted to the jury at trial.[9]

3.  The False Arrest Claim

The parties cross-move for summary judgment on the question whether Asam, Morra, and Wilhelm falsely arrested King.  The dispute boils down to whether the arresting officers lacked probable cause.  I may answer this question at this stage of the lawsuit if there is no material dispute "as to the pertinent events and the knowledge of the officers."  *Weyant v.*

---

[9]  At that time, the parties shall address by letter the application of the intra-corporate conspiracy doctrine.  *See Salgado v. City of New York*, No. 00 Civ. 3667(RWS), 2001 WL 290051, at *9 (S.D.N.Y. Mar. 26, 2001) (holding that intra-corporate conspiracy doctrine barred § 1985(3) claim when "[a]ll of the individual Defendants are officers, agents and employees of a single corporate entity, the City of New York"); *see also Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir.1978), *cert. denied*, 439 U.S. 1003 (1978) (§ 1985(2)); *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 71-72 (2d Cir.1976), *cert. denied*, 425 U.S. 974 (1976) (§ 1985(3)).

*Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  Alternatively, summary judgment for the defendants is appropriate even when the facts are in dispute, as long as the facts as alleged by the plaintiff support a finding of probable cause.

"There can be no federal civil rights claim for false arrest where the arresting officer had probable cause." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118-19 (2d Cir. 1995), *cert. denied*, 517 U.S. 1189 (1996) (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)).  Under New York law,[10] "[a]n arrest made without a warrant is presumed to be unlawful, and the burden rests with the police officer to prove legal justification." *Decker v. Campus*, 981 F. Supp. 851, 857 (S.D.N.Y. 1997) (citing *Broughton v. State*, 37 N.Y.2d 451, 453 (1975)).  "Probable cause to arrest exists 'when the [arresting officers] have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested.'" *United States v. Ceballos*, 812 F.2d 42, 50 (2d Cir. 1987) (quoting *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir.1983)) (alteration added).  The inquiry into probable cause looks to the totality of the circumstances, *Illinois v. Gates*, 462 U.S. 213, 230-32 (1983), considering "those facts available to the officer at the time of the arrest and immediately before it," *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996).  *See also Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

Defendants argue that probable cause was established by, in order of sequence, (1) Carabali's on-site identification of King as the would-be robber of his livery vehicle on April 22, 1999; (2) Carabali's subsequent signing of an accusatory instrument against King; (3) the

---

[10]     Claims of false arrest and imprisonment under § 1983 and New York law are substantially similar. *See Singer*, 63 F.3d at 118.

line-up identifications of King by other livery drivers; (4) the various written and videotaped incriminating statements made by King to the police on April 23, 1999; and (5) King's guilty plea to the robbery of Jose Rodriguez.

These arguments fail because they suppose the truth of the arresting officers' version of the relevant events. King's version of those events precludes a finding of probable cause based upon the identification by Carabali. Taking the facts in the light most favorable to King, the arresting officers effected their seizure of King as the perpetrator of a disturbance *before* the identification by Carabali. *See* Pl. Br. 1. Carabali's identification was thus not part of the array of facts known to the officers "at the time of the arrest and immediately before it." *Lowth*, 82 F.3d at 569. The defendants' reliance upon the post-arrest accusatory instrument, lineup identifications, and confession is similarly misplaced, as those statements were -- on King's version of the facts -- elicited after King's initial arrest.[11]

Defendants' argument based upon King's plea of guilty to the Rodriguez robbery is also erroneous. A valid guilty plea can provide a defense to a false arrest claim. *See Cameron v. Fogarty*, 806 F.2d 380, 388 (2d Cir. 1986), *cert. denied*, 481 U.S. 1016 (1987). But the defense applies only if the defendant pleads guilty to "the offense for which he was arrested." *Roundtree v. City of New York*, 778 F. Supp. 614, 619 (E.D.N.Y. 1991). King's version of the facts is that the officers arrested him for being the perpetrator of a "disturbance," not for the robbery of Rodriguez. Pl. Br. 1; *see also* King Dep. 138-39, Aug. 1, 2001. Viewing the

---

[11]     To the extent defendants seek to buttress the credibility of the arresting officers' testimony with those post-arrest statements, that effort is not relevant at this stage of the lawsuit.

evidence in the light most favorable to King, therefore, the defendants' arguments fail.[12]

It is nevertheless true that the facts viewed in the light most favorable to King are compatible with a finding of probable cause. King claims that the officers arrested him because he was walking on the corner of 29th Avenue and Gilmore Street at the "p[re]cise time" a 911 caller reported a "disturbance" there by a large group of individuals whose descriptions were not given. Pl. Br. 1. The officers thus had reason to believe a disturbance had occurred very recently, and King's proximity could have led them to the conclusion that he was a perpetrator. King's claim that he was the only person on the scene -- and thus the only likely suspect -- only strengthens this conclusion.

Moreover, even if those circumstances did not establish probable cause, the same result would obtain because the arresting officers would be entitled to qualified immunity on the question. *Saucier v. Katz*, 533 U.S. 194, 201-05 (2001) (qualified immunity inquiry in excessive force context asks first whether a constitutional violation has occurred, second whether right in question is clearly established, and third whether arresting officer had "a mistaken understanding as to whether a particular amount of force [was] legal in those circumstances"). Accepting as true King's claim that he was the only person on the block when the officers received a report that there had been a disturbance, the arresting officers had, at the least, "arguable probable cause" to arrest King for that disturbance. *Escalera v. Lunn*, 361 F.3d 737, 746 (2d Cir. 2004)

---

[12]     Defendants ask that I read *Cameron* for the broader proposition that a guilty plea establishes a conclusive presumption of probable cause even for an unrelated arrest. As support for this conclusion, defendants point out that an arrest is lawful so long as there is probable cause to arrest for any crime, even if that crime is not ultimately charged. *See Devenpeck v. Alford*, 543 U.S. 146 (2004). Defendants argue that *Cameron* compels a presumption that the police had probable cause to arrest King for the Rodriguez robbery, and *Devenpeck* extends that presumption to probable cause to arrest for any crime. Defendants point to no authority for their interpretation of *Cameron*. Because I grant defendant's motion on other grounds, I decline defendant's invitation to establish such a rule of law.

("The relevant standard under arguable probable cause is whether officers of reasonable competence could disagree on whether the probable cause test was met.").  I thus conclude that King's § 1983 false arrest claim fails as a matter of law.  Defendants' motion is granted on this question, and King's cross-motion is denied.

King's claim that the police arrested him because he is black is not relevant to this conclusion, because "motivation is not a consideration in assessing probable cause."  *Singer*, 63 F.3d at 119 (citing *Mozzochi v. Borden*, 959 F.2d 1174, 1179-1180 (2d Cir. 1992)).  With respect to King's § 1985(2) and § 1985(3) claims, by contrast, King's evidence of race-based animus on the part of the police is relevant.  Nevertheless, I must conclude that the § 1985 claims fail as a matter of law.  Lacking any claim of a conspiracy "with respect to judicial proceedings in a State or Territory," King has no claim pursuant to the second clause of § 1985(2).  *Herrmann v. Moore*, 576 F.2d 453, 457 (2d Cir. 1978), *cert. denied*, 439 U.S. 1003 (1978).  And lacking any meritorious claim that he was "deprived of" a relevant "right of a citizen of the United States," *Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 2000), *cert. denied*, 534 U.S. 816 (2001) (citation omitted), *i.e.*, lacking a predicate false arrest claim, King has no claim pursuant to § 1985(3).  Accordingly, defendants' motion for partial summary judgment on the § 1985 false arrest claim is granted, and King's cross-motion is denied.

4.  The Cover-up Conspiracy Claim

The parties cross-move for summary judgment on whether Johnson, Pinto, McPherson, Campisi, Carbone, and Cox conspired to cover up misconduct committed by the arresting officers during the course of King's arrest on April 22, 1999.  To prevail on his conspiracy claims, King must demonstrate, among other things, an "agreement" between the

named defendants to violate his constitutional rights.  *See Bussey v. Phillips*, 419 F. Supp. 2d 569, 586-87 (S.D.N.Y. 2006) (§ 1983); *Wright v. New York City*, No. 02CV4251 (JFB)(LB), 2006 WL 1212155, at *13 (E.D.N.Y. 2006) (§ 1985(3)).  Defendants argue that King has not set forth any evidence of an agreement.  I agree, and grant summary judgment in favor of defendants on King's cover-up conspiracy claims pursuant to §§ 1983, 1985(3), and 1986.[13]  King's cross-motion is denied.

The central player in the conspiracy, according to King, was Carbone.  King alleges that Carbone concealed the 911 report about the "disturbance" and fabricated the time reflecting King's arrest on his "crime report" from 2241 hours to 2247 hours, to misrepresent that King was arrested only after the identification by Carabali.  King also claims that Carbone conspired with the arresting defendants to misrepresent that the officers witnessed King attempting to rob Carabali.  *See* Pl. Br. 9-10.  King appears to argue that the other players participated in the same agreement to provide a cover story for King's arrest.

The primary defect with King's theory is that the agreement as alleged does not relate to a constitutional injury, because, as discussed above, King's arrest was not unconstitutional.   But I pass over the issue whether summary judgment should be granted on the conspiracy claims for lack of an underlying constitutional violation, because I construe King's claim to allege in the alternative that the defendants conspired to cover up the arresting officers' use of excessive force.  As discussed above, an issue of material fact remains as to whether King's constitutional rights were violated by the arresting officers' excessive force.

---

[13]        King's conspiracy claim pursuant to § 1986 fails as a matter of consequence, because such a claim is predicated upon a valid § 1985 claim.  *Dacey v. Dorsey*, 568 F.2d 275, 277 (2d Cir. 1978), *cert. denied*, 436 U.S. 906 (1978).

Even so construed, however, King's claims fail as a matter of law because he offers no evidence from which a rational juror could conclude the named defendants reached an agreement to cover up the use of excessive force. King claims that Carbone prepared a "cover story" about the arrest in the memorandum he wrote to his supervisor about the arrest. This memorandum is evidence of an agreement, King argues, because it resolved certain inconsistencies in the stories the arresting officers presented to Carbone about when during the course of the arrest King dropped his knife. King points to a statement by Carbone that he represented in the memorandum that "plaintiff quickly exited the vehicle with knife in hand and was disarmed after a violent struggle," Defendant Carbone's Responses and Objections to Plaintiff's Interrogatories and Requests to Admit 4, and says it conflicts with Morra's representation that King dropped the knife before any contact with the officers, *see* Morra Aff. ¶ 15. But there is no evidence that Carbone knew of Morra's version of the story when he wrote the police memorandum (indeed, the memorandum itself does not appear in the record). Accordingly, King provides no evidence that Carbone agreed to cover up the use of excessive force. King thus has only his own conclusory allegation that Carbone, Asam, Morra, and Wilhelm went to "any length" to ensure that "the truth about plaintiff's arrest" was not "leak[ed]." Pl. Br. 9. Such allegations are not evidence. They therefore cannot support King's conspiracy claim against Carbone.

King's allegations of a conspiracy are even weaker as against the other defendants. King alleges that Cox misrepresented to the press that King stabbed Carabali and made "personal remarks" about King's "fetish" for Lincoln Town Cars, Pl. Br. 10, but points to no actual evidence indicating an agreement to cover up the arresting officers' use of excessive

force.  King alleges that McPhearson and Campisi participated in the conspiracy by "turning a blind eye to any police misconduct," but fails to link these defendants to an agreement by the mere statement that they were in "the same investigative team" as the arresting officers.  *Id.*  King alleges that Johnson, as a supervising assistant district attorney, knew that Carabali suffered no injuries on April 22, 1999, but nonetheless filed a criminal complaint stating that Carabali suffered "bleeding and substantial pain" as a result of King's assault.  Compl. 2, *People v. King*, No. 99Q0019749 (N.Y. Crim. Ct. Apr. 23, 1999).  King provides no evidence to support the proposition that Johnson knew Carabali suffered no injuries, however.  Finally, King alleges that Pinto was Johnson's "eyes and ears," who shared "common interests" with the arresting officers, Pl. Br. 14, but, again, provides no evidence of an agreement between those parties.

     5.     <u>The Coerced Confession Claim</u>

     The parties cross-move for summary judgment on the question whether defendants Johnson, Pinto, McPherson, and Campisi coerced three sets of self-incriminating statements from King in violation of the Due Process Clause of the Fourteenth Amendment.[14]  King argues that the videotaped and written statements he provided were obtained by unconstitutional coercion.

     The due process question is whether the statements made by King were voluntary.

---

[14]     King claims that the coercion also deprived him of rights guaranteed by the Fourth and Fifth Amendments.  The elicitation of incriminating statements, however, is not customarily treated as a "search" or "seizure" for Fourth Amendment purposes.  *But see Boyd v. United States*, 116 U.S. 616, 633 (1886) ("[T]he 'unreasonable searches and seizures' condemned in the fourth amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the fifth amendment; and compelling a man 'in a criminal case to be a witness against himself,' which is condemned in the fifth amendment, throws light on the question as to what is an 'unreasonable search and seizure' within the meaning of the fourth amendment.").  Furthermore, modern doctrine analyzes the coercion of statements under the Due Process Clause, *see Brown v. Mississippi*, 297 U.S. 278, 286 (1936), even though "the Fifth Amendment privilege against compulsory self-incrimination applies to the States," *Colorado v. Connelly*, 479 U.S. 157, 163 (1986).

*See Colorado v. Connelly*, 479 U.S. 157, 164 (1986); *see also United States v. Orlandez-Gamboa*, 320 F.3d 328, 332 (2d Cir. 2003) ("A confession is admissible under the Constitution only if it is made voluntarily.").  The term "voluntary" has a specialty meaning in this analysis; after all, much of the point of custodial interrogation is to obtain statements the suspect would not otherwise have chosen to make.  The question is whether the statements were obtained so involuntarily as to render the process of conviction based upon those statements a "mere pretense." *Brown v. Mississippi*, 297 U.S. 278, 286 (1936).  "'No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances.'" *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997) (quoting *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988)).  Factors include "the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics." *Id.*  Ordinarily, a voluntariness inquiry is unsuitable for summary judgment because the inquiry is so fact-intensive.  Here, though, judgment as a matter of law is warranted because King does not set forth sufficient evidence of involuntariness.

King argues first that his confessions were involuntary because he was "mentally, physically, and [psychologically] impaired" due to the arresting officers' excessive use of force in executing his arrest, and therefore "could not have been in a normal state of mind" during his interrogation the following day.  Pl. Br. 16.  The evidence of King's impairment does not support that conclusion.  An allegation of physical impairment does not by itself suffice to render a

24

confession involuntary.  *See, e.g.*, *United States v. Khalil*, 214 F.3d 111, 121-22 (2d Cir. 2000),

*cert. denied*, 531 U.S. 937 (2000) (upholding denial of motion to suppress statements made

intermittently while patient was undergoing several post-surgery procedures); *Campaneria v.*

*Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989), *cert. denied*, 499 U.S. 949 (1991) (statements not

coerced when hospital patient was "alert and awake despite his pain" and interrogation periods

kept short).  But the impairment is all King puts forward: he provides no evidence linking that

impairment to the techniques used by the police to elicit from him the incriminating statements.

For example, King might have pointed to evidence that the police exploited his weakened state

by interrogating him directly after his alleged beating.  *See Lynumn v. Illinois*, 372 U.S. 528, 534

(1963) (oral confession of Lynumn involuntary when "made only after the police had told her

that state financial aid for her infant children would be cut off, and her children taken from her, if

she did not 'cooperate'").  Or he might have pointed to some evidence that the interrogations

were unduly lengthy given his weakened condition.  *See Mincey v. Arizona*, 437 U.S. 385, 400-

02 (1978).  King's mere statement that he was impaired by the circumstances of his arrest, even

supposing its truth, supplies no such link to the circumstances of his confession.[15]

        Second, King argues that his incriminating statements were coerced because the

police threatened to fire his "common law wife" from the New York Police Department if it

turned out he had used her service revolver when committing a crime.  Pl. Br. 16; *see also* King

Dep. 285-87, Aug. 2, 2001.  But this threat was no artifice -- police have a legitimate interest in

regulating their employees' use of service firearms.  *Compare Spano v. New York*, 360 U.S. 315,

---

[15]    For the same reasons King cannot rely upon the recommendation by a psychiatrist at Elmhurst Hospital that King undergo psychiatric care in an out-patient setting.  *See* Defendant's [*sic*] Local Rule 56.1 Statement ¶¶ 36-37.  That recommendation is evidence that King required medical care for his mental health.  It is not evidence linking his mental health to the circumstances attending his interrogation.

323 (1959) (confession involuntary when, among other things, officer who was a friend of defendant falsely told defendant he would lose his job unless defendant confessed). Taking the evidence in the light most favorable to King, the threat was certainly calculated to get him to confess. But merely pointing to the use of legitimate techniques of leverage in an interrogation is insufficient to demonstrate a genuine issue of whether the statements elicited were involuntary.

In sum, King has failed to set forth sufficient evidence reflecting a genuine dispute exists as to whether his confession was voluntary, so his § 1983 coerced confession claim is dismissed. As there exists no underlying deprivation of his rights, his conspiracy claims pursuant to §§ 1983, 1985, and 1986 are also dismissed.[16]

6.      The Malicious Prosecution Claims

King argues that the arresting officers (Asam, Morra, and Wilhelm), along with Carbone, Cox, McPherson, and Campisi, maliciously prosecuted King for the robbery of Carabali. To prevail on a malicious prosecution claim, King must demonstrate the elements of the claim under New York law: "that a prosecution was initiated against him, that it was brought with malice [and] without probable cause to believe that it could succeed and that the prosecution terminated in favor of the accused plaintiff." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003). King's malicious prosecution claim fails because, for the reasons discussed above, he points to no evidence that the defendants lacked probable cause for his arrest. King

---

[16]      King's remaining argument is frivolous. King claims his confession was involuntary because he could not possibly have committed the April 2, 1999 robbery he confessed to, since the victim described the perpetrator as a male Hispanic or white individual (King is black). It asks too much for me to infer from the lone fact that the robbery victim believed the perpetrator was white or Hispanic that King could not have been that perpetrator, and therefore that his confession was false, and therefore that the confession was involuntary. King's argument casts merely a metaphysical doubt upon the voluntariness of his confession.

claims that probable cause for arresting him for the robbery of Calabari "dissipated," that is, that "additional facts came to light that negated probable cause." *Dukes v. City of New York*, 879 F. Supp. 335, 342 (S.D.N.Y. 1995). He is correct that the police never secured an indictment against him for the Carabali complaint. But the fact that a prosecution was unsuccessful, without more, is not enough to demonstrate a dissipation of probable cause. *See Krause v. Bennett*, 887 F.2d 362, 370 (2d Cir. 1989). Because King's remaining arguments are the same as ones I have rejected in analyzing his false arrest claim, I conclude that King has failed to offer sufficient evidence to support his malicious prosecution claim as to Carabali.

King also argues that Johnson, Pinto, McPherson, and Campisi manufactured evidence by coercing livery drivers Mendez and Choundry into falsely implicating King as a perpetrator of their robberies. He bases the argument entirely upon the claim that Mendez and Choundry provided the information for accusatory instruments against King for those robberies, but never identified him in a line-up. King offers no evidence to support his claim about the Mendez identification, however, and the defendants provide evidence refuting it. An arrest report supplement relating to the Mendez robbery, authored by Campisi, states that King was identified "in line-up" between 1610 and 1611 hours on April 23, 1999. *See* Bruzzese Decl. Ex. T. King is correct that defendants offer no evidence that Choundry identified him in a line-up, but he is incorrect that a rational juror could take that omission to indicate that the defendants coerced Choundry into implicating King, because King's signed, written confession went some considerable way toward identifying him as the perpetrator of the April 2, 1999 robbery of Choundry. Because there is no evidence that the two witnesses were coerced, this claim too is dismissed as a matter of law.

As King's underlying § 1983 claims alleging a deprivation of a constitutional right have been dismissed, I must also dismiss his conspiracy claims pursuant to §§ 1983 and 1985.

7.      The Enterprise Liability Claims

King attempts the hold the City of New York liable pursuant to the principles articulated in *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and *City of Canton v. Harris*, 489 U.S. 378 (1989). King argues that the City has a policy "to only record and video tape the actual [i]ncriminating statement that a suspect makes and disregard the events or *not* video tape how they arrived to the incriminating evidence or the facts and circumstances the criminal defendant was faced with before he decided to incriminate himself." Pl. Br. 25-26. Read literally, of course, this arguments fails as a matter of law because it is not a constitutional violation for the police not to videotape a custodial interrogation. Read more charitably, King's argument is that the City has a policy of conducting coercive interrogation off camera, which produces confessions that appear voluntary on camera. As I have dismissed King's coerced confession claims, however, I must also dismiss his *Monell* claim. Since King's failure to supervise claim proceeds on the same predicate deprivation of rights, I must dismiss that claim too.

B.      *The Petition for a Writ of Habeas Corpus*

King challenges his conviction of robbery in the second decree, predicated upon his plea of guilty to that crime, on four grounds: (1) Johnson knowingly obtained perjurious and contradictory testimony from Rodriguez in the grand jury proceedings; (2) Pinto and McPherson conspired to manufacture an identification from Rodriguez of King as the perpetrator of the

robbery, in addition to a statement from Rodriguez that the perpetrator wore a baseball hat during the robbery, not a ski mask (as was allegedly reported in a 911 call about the robbery); (3) King's plea was not knowing and voluntary because Johnson and King's defense counsel knowingly withheld *Brady* material from King; and (4) King's defense counsel was constitutionally ineffective because he conspired with the prosecutor and wrongly advised King to plead guilty.  For the reasons set forth below, the petition is denied.

      1.    <u>The AEDPA Standard of Review</u>

      The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed the scope of federal habeas review of state convictions when the state court has adjudicated a petitioner's federal claim on the merits.  *See* 28 U.S.C. § 2254(d).  Under the AEDPA standard, the reviewing court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[17]  *Id.* § 2254(d)(1).  The Supreme Court has interpreted the phrase "clearly established Federal law" to mean "the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001), *cert. denied*, 535 U.S. 1064 (2002).

      A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially

_____

[17]    Habeas relief is also warranted where the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  That subsection is not relevant to this challenge.

indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established Supreme Court law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* "In other words, a federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)).

Under the "unreasonable application" standard set forth in *Williams*, "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist*, 260 F.3d at 93 (quoting *Williams*, 529 U.S. at 411). Interpreting *Williams*, the Second Circuit has added that although "'[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Id.* (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

As stated above, this standard of review applies whenever the state court has adjudicated the federal claim on the merits. "For the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to a judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

2.     <u>The Elicitation of Perjury and Manufactured Evidence Claims</u>

I cannot consider granting King habeas relief on his first two claims because he has procedurally defaulted upon them. *See Coleman v. Thompson*, 501 U.S. 722, 730-32 (1991) (no habeas relief when a federal claim has been procedurally defaulted in state court). Here, the New York State Supreme Court held that King had forfeited a challenge to the pre-indictment conduct of the prosecution and police, because he had pled guilty to the crime charged and failed to contest that plea on direct appeal. *People v. King*, Ind. No. 1028/00, at 2-3 (N.Y. Sup. Ct. Oct. 15, 2002) (Blackburne, J.). This holding accords with settled New York law. *See People v. Taylor*, 65 N.Y.2d 1, 5 (1985) ("A guilty plea not only constitutes an actual waiver of certain rights associated with a trial, but also effects a forfeiture of the right to renew many arguments made before the plea."); *People v. Di Raffaele*, 55 N.Y.2d 234, 240 (1982) ("[W]here defendant has by his plea admitted commission of the crime with which he was charged, his plea renders irrelevant his contention that the criminal proceedings preliminary to trial were infected with impropriety and error; his conviction rests directly on the sufficiency of his plea, not on the legal or constitutional sufficiency of any proceedings which might have led to his conviction after trial.") (citation omitted).

I must defer to the New York State Supreme Court's holding that King's claims were "both procedurally barred and without merit." Ind. No. 1028/00, at 3. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) (the "state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision). The default did not expire on appeal, because the Appellate Division affirmed without opinion. Where "the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not

silently disregard that bar and consider the merits." *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). That the Appellate Division included in its order a lone citation does not rebut the presumption, *see id.* at 805-06 (holding that state supreme court decision consisting solely of two citations was unexplained affirmance of the lower court's reliance on procedural default), especially because the cited case itself concerned a procedural default. *See People v. Pellegrino*, 60 N.Y.2d 636, 636 (1983) (barring review of a guilty plea claim on preservation grounds).

King has not demonstrated cause for the default and actual prejudice from the alleged perjury or the coerced identification; nor has he demonstrated that my failure to consider his claim will result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750. Accordingly, his first two claims are denied.

3. The Exculpatory Evidence Claim

King argues that the prosecution violated his rights under the Due Process Clause of the Fourteenth Amendment because it did not turn over to King's defense counsel the SPRINT report[18] of a 911 call about the Rodriguez carjacking, in violation of the prosecution's obligation to turn over material "evidence favorable to an accused." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). *See also United States v. Agurs*, 427 U.S. 97, 107 (1976) (prosecution must disclose clearly exculpatory information even lacking a defense request). According to King, the SPRINT report in question reflects a 911 call by Rodriguez describing the perpetrator of his robbery as "an 18 yr old who wore a skimask," accompanied by "five black males," which, King argues, means Rodriguez could not have correctly identified King in a later line-up. Petitioner's

---

[18]     A SPRINT report reflects, *inter alia*, conversations between the 911 operator and a 911 caller, which are recorded in a computer database; the reports also include police and dispatcher transmissions. *Avellino* H'g Tr. 6-7.

Affidavit in [S]upport of [A] [W]rit of Hab[ea]s Corpus ("King Aff.") 2. King also claims the 911 call description conflicts with a description Rodriguez later gave the police, reflected in a police complaint report, which stated that the perpetrator wore a baseball hat and omitted mention of a ski mask. *See* Bruzzese Decl. Ex. E (Complaint Report of Rodriguez, Mar. 31, 1999). Essentially, King argues that the SPRINT report was impeachment evidence that should have been disclosed because "the witness in question [*i.e.*, Rodriguez] supplied the only evidence linking the defendant to the crime." *United States v. Avellino*, 136 F.3d 249, 256 (2d Cir. 1998).

At a hearing I conducted on this matter, an expert witness for the government explained that the SPRINT report in question indeed reflects a description of the "perp" as a "male, black approximately 18 years old, wearing an army jacket with ski mask," who "took [a] burgundy or red Lincoln Town Car" with New York plates. According to the description, the car was "occupied by five male blacks," and the "perp was armed with a knife." H'g Tr. 11-12. Contrary to King's claim, however, the witness explained that the description came not from a 911 call but from a police radio transmission. *See* H'g Tr. 23. Another item in the report did indicate a call from the victim of the carjacking, but that call did not provide a description of the perpetrator -- the caller reported only that the perpetrator had called him to tell him where he had dropped off the stolen vehicle. *See* H'g Tr. 25. The source of the ski-mask description is therefore unclear from the report.

King argues that his *Brady* challenge is not procedurally barred because it goes to the nature of his guilty plea. *See* Pet. 10 ("Petitioner's guilty plea was not 'knowingly & intelligently made' because the prosecutor & defense counsel suppressed evidence that would

have exonerated the petitioner[.] Petitioner would not have pleaded guilty had he known about the "Brady Material" . . . or suppressed evidence."). Even were I to agree with King on this point, however, I would still have to deny his petition by deferring to the state court's rejection of the claim on the merits, because it is not clearly established Supreme Court law that a defendant has a right to impeachment evidence prior to a guilty plea. In fact, the Supreme Court held the opposite in *United States v. Ruiz*, 536 U.S. 622, 633 (2002).

And even if *Ruiz* did not preclude King's claim I would reject it as a factual matter, based on the "likely persuasiveness of the withheld information." *Avellino*, 136 F.3d at 256. The evidence adduced at that hearing does not indicate that Rodriguez was the source of the description of the perpetrator as a man in a ski-mask accompanied by five male blacks. Accordingly, I am not persuaded that the description given by Rodriguez in the police complaint is at odds with baseball-hat description he provided to the police later, and thus I have no reason to believe the SPRINT report would call in to question the credibility of Rodriguez's identification.[19]

4. The Ineffective Assistance Claim

King also challenges the knowing nature of his plea on the ground that the assistance of his court-appointed counsel was constitutionally ineffective. King argues that his counsel improperly allowed him to plead guilty without investigating the legal significance of the SPRINT report and its underlying 911 tape. Relatedly, King argues that his counsel were involved in a conspiracy with the prosecution. *See* Pet. 3.

---

[19]  At the hearing, King argued that the 911 tape upon which the SPRINT report was based might have provided additional, and possibly material, information. That tape cannot be the basis of a *Brady* claim, however, because it was disclosed by the prosecution, as King himself acknowledges. *See* King Aff. 3 (citing Affirmation in Opposition of Richard Johnson 3-4).

Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a convicted defendant challenging the constitutional adequacy of his counsel's assistance "must show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." To determine whether performance was constitutionally deficient, the court must judge "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally adequate assistance." *Id.* at 690. Such acts must "[fall] below an objective standard of reasonableness" set by "prevailing professional norms." *Id.* at 688. Moreover, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. On the prejudice side, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A challenge to performance at trial presents "the question . . . whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

In the first place, I find that King has not met his burden to show that his counsel failed to investigate the significance of the SPRINT report or discuss the report with him. Counsel states that a copy of the report in question appears in King's file. Maltz Aff. ¶ 4. Counsel also states, "I am sure that I must have followed my invariable practice and discussed with petitioner the significance of the Sprint Report, which detailed a description that differed from the description that was given in the grand jury minutes. I would also have explained to him the use that could have been made at trial of the inconsistencies between these two documents." *Id.* ¶ 7. As for the underlying 911 tape, King acknowledges that it was disclosed to counsel. In light of such evidence, King does not persuade me that his counsel "suppressed

evidence that would have exonerated the petitioner." Pet. 10. Because I cannot conclude that the claimed misconduct of defense counsel actually occurred, I have no need to address whether the acts were constitutionally ineffective assistance.

Moreover, even supposing counsel did not investigate the SPRINT report or discuss it with King, it would not be constitutionally ineffective for counsel to recommend King plead guilty. King was offered five years' incarceration and the dismissal of bail-jumping charges, not the nine to 25 year sentence he would have likely received had he been convicted at trial. Moreover, the prosecution's evidence included a lineup identification by the victim and a written confession that corresponded in relevant detail with Rodriguez's contemporaneous complaint. King cannot defeat the strong presumption that counsel's recommendation to take such a favorable deal was effective performance in light of such evidence. For similar reasons, King has not met his burden to show he would not have pled guilty had counsel investigated or discussed with him the SPRINT report.

## CONCLUSION

For the foregoing reasons, in No. 99 CV 3669, (1) the parties shall proceed to trial on King's §§ 1983 and 1985(3) excessive force claims; (2) King's motion for summary judgment on his remaining claims is denied; and (3) defendants' motion for partial summary judgment is granted. With respect to No. 05 CV 3247, (4) King's petition for a writ of habeas corpus is denied, and I conclude that, because King has failed to make a substantial showing that he was deprived of a constitutional right, no certificate of appealability shall issue.

Jury selection and trial in No. 99 CV 3669 shall commence on Monday, May 21, 2007 at 9:30 a.m. in Courtroom 6C-South.

So ordered.


John Gleeson, U.S.D.J.

Dated: Brooklyn, New York
      March 30, 2007